### R. M. COWARD *v.* THE STATE.

1. CONTINUANCE. — Legal diligence is clearly wanting when it appears that an attachment for witnesses who lived in an adjoining county was placed for service in the hands of the sheriff of the county of the forum, though alleged that the witnesses resided at a point more accessible to that officer than to the sheriff of the county of their residence.

2. SAME. — Note in this case a showing for a second continuance held to be insufficient in respect of diligence and of the materiality of the absent testimony.

3. MURDER — EVIDENCE OF MOTIVE. — In a trial for murder, the State was allowed, over objections by the defence, to adduce in evidence an indictment against the defendant's brother for theft from the deceased, and to prove by the defendant's brother that he was the person so indicted, and a brother of the defendant. *Held*, that such proof was competent evidence to show a motive for the homicide.

4. PRACTICE. — When there is an irreconcilable conflict between the testimony for the State and that for the defence, it is the peculiar province of the jury, in arriving at their verdict, to determine which testimony shall have credence and which be disregarded.

5. FACT CASE. — Note evidence which, notwithstanding proof of *alibi*, is held sufficient to sustain, on appeal, a conviction for murder in the first degree.

APPEAL from the Criminal District Court of Harris. Tried below before the Hon. G. COOK.

The indictment was for the murder of Adolph Schachtrupp, and the conviction upon trial was for murder in the first degree. The opinion shows the matters alleged as cause for a second continuance.

Adolph Bachman was the first witness sworn for the State, and he testified, in substance, that the deceased, who was killed by the appellant in Houston, Harris County, Texas, on the thirty-first day of October, 1878, was his uncle. After six o'clock on the evening named, witness saw a man on horseback on the street in front of the house of the deceased. The man had been standing there for perhaps the half of an hour, when witness went out to the gate, and the appellant said, " Hollo, does Schachtrupp live here?" Witness responded, " Yes, he does ; what do you want with him?" To which appellant responded, " None of your business." Appellant added that he had a note for him, and wanted to see him, at the same time directing witness to call the deceased. While appellant and witness were talking, deceased came out, and right there and then the appellant shot him, the first shot taking effect in the stomach, and

the second missing. Deceased died about a half-hour after he was shot.

Cross-examined, the witness said that he saw the man ride up in front of the gate and stop in the street about half an hour before he hallooed, and then witness went out. Witness went to the gate, from which the appellant stood some five or six feet distant, on the outside. Appellant shot deceased as soon as the latter came out of the house. It was dark, and witness does not recollect whether or not it was a moonlight night. Witness could see the appellant. He had on a gray coat and a black hat; was riding a bay pony, with blaze face, and two white hind feet. Witness knew the horse as the same which belonged to Bill Coward, and which the said Bill Coward habitually worked in his wagon. As soon as appellant shot, he wheeled his horse and rode off towards the Washington Road. Witness then went up to the house of his cousin, a son of the deceased, who lived about one mile from where deceased lived, and beyond the cemetery. On the way, near the residence of Mrs. Sheitel, half-way between the houses of deceased and his son, witness saw the horse ridden by the man who shot the deceased, grazing on the edge of the road, with bridle and saddle on. It was the same horse.

Witness told his cousin of the killing of his father; but his cousin, being afraid, refused to go to the house of the deceased. Some one came to the house of witness's cousin while witness was there, and called; but, as they were afraid, the door was locked. Witness remained a very short while at his cousin's, and got back to deceased's house just as he was dying. On his return, witness noticed that the horse was gone from near the road where he saw him on his way up. Bill Coward did not call at the house of witness's cousin while he was there, and witness does not know why he said so when he testified before the coroner's inquest. Witness's cousin and family were afraid that a man who passed the house when they locked the door was Bill Cow-

ard. Witness did swear at the inquest that it was Bill
Coward who did the killing, and his reason was that he
was frightened at the time. Witness knows now that it
was appellant who did the killing. Witness heard, the day
after the killing, that Bill Coward was in jail in Anderson,
and did not swear until afterwards that the appellant did
the killing. The two Cowards do not look much alike.
Bill has black hair and moustache, and the appellant has
whitish hair. The man who did the killing had short whis-
kers all over his face, and they were of a clear yellowish
color. Witness was so much frightened at the time that he
was mistaken in the man. Witness knew Bill Coward bet-
ter than he knew the appellant; and it was the deceased
who told witness, about five weeks before the killing, who
the appellant was. Witness had never spoken to appellant
before the shooting. Witness did not swear before the
examining court that the man who did the shooting had on
a black coat and black hat. Witness has testified twice
before in regard to this killing, — before the coroner's inquest
and the examining court. The sheriff of Harris County
came to witness after the arrest of appellant, and asked him
to go and see if he could identify him. Witness went into
the jail with Mr. Brown, and, among other men, saw and
identified the appellant as the man who did the killing.
Witness told, outside the jail, after he had come out,
that appellant was in there; and afterwards asked appel-
lant, through the jail gate, if his name was not Dick
Coward.

Reëxamined, the witness said that a double-barrelled
shot-gun, charged with buckshot, was used in the shooting.
One charge hit the deceased, and the other missed him, going
into the window. Witness thought that the man who did
the shooting struck at him with the gun; or, at all events,
he swung the gun around. Witness was not frightened
while he was talking to the appellant, and not until the
shooting commenced. Some of the Cowards were present.

when witness first testified in regard to the death of the deceased.

Dr. Archer, sworn for the State, testified that he lived near the deceased; heard two shots, and then learned that Schachtrupp had been killed. Witness immediately went over, a distance of some two or three hundred feet, and found him dying. He was speechless, and died in about half an hour after the shots were fired. His death was caused by buckshot, which entered near the navel, penetrated the body, and lodged against the skin of the back. Witness had no knowledge as to the person by whom they were fired.

P. E. Freeman, for the State, testified that he heard the shots, and saw a man come out of Young's Avenue, on which Schachtrupp lived, and turn into the Washington Road. He was riding very fast, and witness only saw him for some six seconds. As he passed, witness was about twenty-five feet from him, but could not tell who he was. He was riding a medium-sized sorrel horse, with a blaze in his face, as witness thought, and white hind feet. The man wore a broad-brimmed dark hat and a black coat, and had his pants stuck in his boots. He had a gun in one hand, and went out the Washington Road at full speed, towards the cemetery. Witness did not know who he was.

John Pipkin, a colored witness, for the State, testified that he knew the accused and Bill Coward, his brother. About dark on the evening of the killing of Schachtrupp, witness saw the accused go into the woods and come out again, leading Bill Coward's horse, which was a kind of a roan or bay speckled horse, with a blaze face and two white feet. The next morning witness heard of the murder of Schachtrupp.

George S. Beale, for the State, testified that he had known the appellant for some four weeks prior to the death of Schachtrupp. About seven o'clock, or a little earlier, in the evening of that event, witness indistinctly heard the shots, and saw the appellant ride by on Bill Coward's horse, at full

speed. Appellant was in the road, and witness on the side-walk. It was after night, but the moon was shining. Appellant had on a black hat and a black coat, and his pants were stuck in his boots. He went towards the cemetery. The horse was a bay, with blaze face and white hind feet, and belonged to Bill Coward. It was Dick Coward, the appellant, who was riding the horse. He was riding so fast that witness thought he was drunk. The place where witness was standing was about a third of a mile from Schachtrupp's.

J. J. Fant, a deputy-sheriff, testified that on the Sunday after the murder he heard where appellant was, and went out to arrest him. After looking around in the house without finding him, witness noticed a bed which seemed too high in the middle, and found the appellant between the mattresses, concealed, and armed with a six-shooter and a Winchester rifle. On his cross-examination, this witness stated that when he arrested the appellant, and told him he was accused of murdering Schachtrupp, he said in reply, "I know nothing about it." There were several indictments in Brazoria County against the appellant.

The State next offered in evidence an indictment against Bill Coward, a brother of the appellant, for the theft of a mule from Schachtrupp, the deceased. This indictment was returned into court by the grand jury of Harris County, on the 15th of October, 1878, which was sixteen days prior to the murder of Schachtrupp. The defence objected to this evidence, on the ground of irrelevancy, and because it was not competent for any purpose as against the appellant. The objections were overruled, and the defence reserved exceptions. The indorsement on the indictment showed that Schachtrupp was a witness in support of the charge of theft against Bill Coward.

C. M. Noble, sheriff of Harris County, a witness for the State, testified that, soon after the appellant was arrested, he was identified in the jail by young Bachman, the first witness for the State, as the person who killed Schachtrupp.

Several other witnesses were examined for the prosecution, but their testimony seems to have but a remote bearing on the case.

The defence opened with the written testimony of Adolph Bachman, the principal State's witness, given at the coroner's inquest; and followed that up with the written testimony of the same witness, given some two weeks later, at the preliminary examination of the appellant. At the inquest, Bachman testified that Bill Coward perpetrated the murder, but in other respects detailed the circumstances substantially as at the final trial, except that no description of the horse ridden by the assassin appears in his testimony at the inquest.

His written testimony at the preliminary examination was quite elaborate, in consequence of a searching cross-examination. In it he identified Dick Coward, the present appellant, as the person who shot his uncle, Schachtrupp. It shows some discrepancy in describing the horse ridden by the assassin, — stating in one place that the animal had "a little white on one hind foot," and in another, that he had "two white hind feet." The witness described himself as a native of Germany, and about seventeen years of age.

Next the defence introduced the written testimony given by the State's witness Pipkin at the preliminary examination of the appellant. In this testimony he made two or more collateral statements which he contradicted at the trial.

Mrs. Ford, for the defence, testified that, about sunset the evening of the day next before that on which Schachtrupp was killed, the appellant passed her house, and said he was going to Clear Creek; and on the third day after the murder he returned to her house, and remained there until his arrest, the same evening. A daughter of this lady testified to the same effect. They live about two miles from Schachtrupp.

M. Perkins, for the defence, testified that he lives in Galveston County, on the south side of Clear Creek, and some twenty-five or thirty miles from Houston, where Schachtrupp was killed. Witness had known the appellant from childhood. On Thursday evening, October 31, 1878, between six and seven o'clock, as witness was going from Alf Perkins's house to his own home, about half a mile distant, he met the appellant going in the direction of Alf Perkins's. The next morning, witness went over to Alf Perkins's, and saw the appellant there. It was nothing unusual to see him in that neighborhood, as he had been raised there. Witness described the personal appearance of the appellant and of Dick Coward, his brother, and stated that no one could mistake one for the other.

Alf Perkins, a colored witness, for the defence, testified that he lived in Galveston County, between twenty and twenty-four miles from Houston. On Thursday evening, October 31, 1878, between seven and eight o'clock, the appellant came to witness's house, stayed there all night, went away the next day, and on the next came back, and left the same evening for Houston. The appellant made witness's house his stopping-place when he came to Clear Creek, in which neighborhood he had been raised, and where he had some horses. He rode a bay horse to witness's house on Thursday evening, and rode a gray horse off the next morning. Witness did not know what became of the bay horse. After that night it disappeared, and he had never seen it since. On his cross-examination, the witness stated that he had no clock, and admitted that the appellant's arrival at his house may have been as late as ten o'clock.

Bill Coward was introduced by the defence, having been brought from the Grimes County jail by a writ of *habeas corpus ad testificandum*. He testified, for the defence, that he was a brother of the appellant, and was in the said jail the night of October 31, 1878, when Schachtrupp was

killed.    On cross-examination, he stated, over exception
by the defence, that he was in custody on a charge of
stealing Schachtrupp's mule.

K. Wagner, for the defence, testified in contradiction
of some of the State's testimony respecting the horse for-
merly owned by Bill Coward, and alleged to be the animal
ridden by the assassin.

Dick Lewis, for the defence, stated that about a month
before the murder he was on Clear Creek, when officers
from Brazoria County came there with an armed *posse*, in
search of Dick Coward, the appellant.

As already stated, the jury found the appellant guilty
of murder in the first degree, and his motion for a new
trial was overruled.    Judgment of death by hanging was
rendered in accordance with law, and this appeal was taken.

No brief for the appellant has reached the hands of the
reporters.

*Thomas Ball*, Assistant Attorney-General, in support of
the admission in evidence of the indictment against the
brother of the appellant, to show a motive for the crime,
cited Burrill on Cir. Ev. 16–20, 295, 302–305, 660–667;
1 Whart. Cr. Law, 649 ; Whart. on Hom. 701 ; Roscoe's Cr.
Ev. 88, and cases there referred to ; *Stout* v. *The People*, 4
Park. Cr. 71, 132 ; *Balaam* v. *The State*, 17 Ala. 451 ;
*Gassenheimer* v. *The State*, 52 Ala. 314 ; *Hendrickson* v.
*The People*, 1 Park. Cr. 406 ; *Dill* v. *The State*, 1 Texas
Ct. App. 287.

WINKLER, J.    The appellant was indicted, tried, and
convicted of murder in the first degree, for the murder of
Adolph Schachtrupp, alleged to have been committed in
Harris County, October 31, 1878, and has appealed from
the judgment, a motion for a new trial having been over-
ruled.    The first question presented for consideration is the
overruling of the application for a continuance.

The application was based on the ground that certain witnesses averred to be material were not in attendance; to wit, Alfred Perkins, Jr., and Daniel Cleary, who, it is stated in the defendant's affidavit, reside in Galveston County, and Austin Coward, who resides in Brazoria County. The diligence employed in order to procure the attendance of the witnesses Perkins and Coward, and the excuse for diligence as to Cleary, are thus stated in the defendant's application, to wit: "That he has used due diligence, and all diligence in his power, to procure the testimony of said witnesses at this term, by causing attachments to be issued for the said witnesses, Alfred Perkins, Jr., and said Austin Coward, on the first day of January, 1879, and at once placed by the clerk of this court in the hands of C. M. Noble, sheriff of Harris County, Texas, the said witnesses residing at a point more accessible to the sheriff of Harris County than the sheriff of Galveston County; and an attachment was at the same time procured to be issued by this defendant for the witness Austin Coward, and placed in the hands of the sheriff of Brazoria County, Texas, in which said county Austin Coward resides; which said attachments have been returned respectively by the sheriffs of said counties, Harris and Brazoria, not found as to said witnesses Alf Perkins, Jr., and Austin Coward, on the 28th of January, 1879. And the said defendant procured an attachment for Daniel Cleary, and the same was by the clerk of the Criminal District Court of Harris County at once forwarded, by due course of mail, to the sheriff of Galveston County, Texas; which said attachment has not been returned by said sheriff, and is not in court. The defendant attaches hereto the attachments in case of the witnesses Alf Perkins, Jr., and Austin Coward, and makes same, together with the return thereon, a part of this motion. * * * That the testimony of said Cleary was not known to affiant at the last term of this court, but as soon as same became known to him, he caused the

attachment referred to above to be issued in the manner aforesaid."

The materiality of the testimony of these witnesses is stated in the application as follows, to wit: "That he expects to prove by said witnesses the following facts, to wit: by Austin Coward, that he left Houston on Wednesday evening, the 30th of October, 1878, the day before the alleged killing of Schachtrupp, for the purpose of going to the Perkins neighborhood, on Clear Creek, a distance of some twenty-five miles from the residence of Schachtrupp; by said witness Alf Perkins, Jr., that the defendant spent the night of Wednesday, the 30th of October, 1878, in the neighborhood of Clear Creek, the distance from Houston as above set out; and by Daniel Cleary, that he and defendant came together at a horse-race, on or near Clear Creek, a distance of some twenty-five or thirty miles from the scene of the killing, on Thursday, the 31st of October, 1878, the very day the killing is alleged to have been done."

The application further states that the affiant does not know of any other person by whom he can prove the above facts; that the witnesses are not, nor is either one of them, absent with defendant's consent, or by his procurement; that he expects to have the witnesses' testimony by the next term of this court; that the testimony cannot be procured from any other source; and that this application is not made for delay, but that justice may be done.

We are of opinion that this application is entirely insufficient, as a second application, in two important particulars, to wit: in the diligence used to procure the attendance of the witnesses, and also as to the materiality. It was not such diligence as the law can recognize, that the defendant caused attachments to issue to one county, when it averred in the application that the witnesses reside in another county. Again, no reason is shown why the necessary steps were not taken to procure the attendance of the witnesses prior to the issuance of attachments, which is stated

to have been January 1, 1879, for the witnesses Perkins and Coward, or that their importance was not known sooner; and as to the witness Cleary, there is no pretence at diligence to ascertain the importance of his testimony until even a later period than the date of issuing processes for the other witnesses. The Code of Procedure, among other things, requires (art. 518) that when a continuance is sought by the defendant in a criminal case, on account of or for the want of a witness, he must state the diligence which has been used to procure the attendance of the witness, and also the facts which are expected to be proved by the witness; and the Code declares that " *it must appear to the court that they are material.*" In examining the application in the light of the surrounding circumstances as set out in the transcript, we are of opinion that the court did not err in refusing the continuance and compelling the defendant to go to trial.

The second bill of exceptions complains of supposed error in admitting testimony for the State, over objections by counsel for the defendant. The most important of these complaints is, that the court admitted in evidence to the jury an indictment found by the grand jury against Bill Coward, a brother of the defendant, and who was then in arrest, charging him with the theft of a mule, the property of the deceased for whose murder the defendant was then on trial. As tending to show a motive for the perpetration of the crime, if such had been necessary, we are of opinion, from an examination of the authorities furnished by counsel for the State, the testimony was admissible; and so with reference to the statements of Bill Coward, on cross-examination, who, it seems, had been brought into court at the instance of the defendant, and the other objections embraced in the bill of exceptions and in the motion for a new trial.

The seventh ground set out in the motion for a new trial is the only other matter which seems to require special notice, and which is as follows: "Because the verdict of the jury

is contrary to the evidence in the case, in this : that the tes-
timony of the defence showed the defendant was not in the
city of Houston, nor in Harris County, when the killing was
done, and the evidence for the State was conflicting and
inferential as to the identity of the person.''

To our minds, the case is not unlike many others which
have come before us on appeal, in which there is an irrec-
oncilable conflict between the testimony of the State's wit-
nesses on the one hand, and those of the defendant on the
other. In such case, the rule is well settled that it is the
peculiar province of the jury, under the Texas system, to
determine which set of witnesses shall have credence and
which be disregarded in making a verdict.

The clear object of the defendant was to prove an *alibi*.
On this proposition the jury evidently disregarded the tes-
timony of the defendant's witnesses. There does not appear
to be any defect in the testimony of the prosecution ; the
only controversy was as to the identity of the defendant,
and for this the testimony was ample, if the witnesses were
credible. The question of the credibility of the witnesses
was fairly and properly submitted to the jury by the charge
of the court ; and upon the testimony and the charge the
jury have said, by their verdict, that, beyond a reasonable
doubt, the defendant is guilty of the murder of Adolph
Schachtrupp. The judge who presided at the trial refused
to set the verdict aside, and in this we find no error.

So far as we are able to determine from the record, the
appellant has had a fair and impartial trial, and has been
legally convicted upon sufficient and legal testimony ; and
though counsel was appointed to defend him on the trial
below, it seems he was ably defended. The proof is abun-
dant that the deceased was called out of his own house at
nightfall, and shot down without warning or the means of
defence or escape ; and the jury and the court have, upon
the evidence, determined that the accused, and he only, is
the guilty perpetrator of the crime. Under these circum-

stances, this court can, under the law, pursue but one course, notwithstanding that by it the accused loses his life. This he has by his own wicked act forfeited under the law, which it is the business of the courts to maintain and see properly enforced.

Finding no error in the judgment, it is affirmed.

*Affirmed.*